FILED

DEC 1 6 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# EXHIBIT A

CR 09-352

## EXHIBIT A -- FACTUAL STATEMENT

### I.    Introduction

1.    This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreements dated December 16, 2009, between the U.S. Department of Justice ("DOJ") and Credit Suisse AG ("Credit Suisse"), a Swiss bank, and between the New York County District Attorney's Office ("DANY") and Credit Suisse.

2.    Beginning in the mid-1990s and continuing through 2006, Credit Suisse systematically violated both U.S. and New York State laws by moving hundreds of millions of dollars illegally through the U.S. financial system on behalf of entities subject to U.S. economic sanctions.

3.    Credit Suisse engaged in this criminal conduct by: (a) removing or falsifying references from outgoing[1] United States Dollar ("USD") payment messages that involved countries, banks, or persons listed as parties or jurisdictions sanctioned by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") (collectively, "the Sanctioned Entities"); (b) advising the Sanctioned Entities how to evade automated filters at U.S. financial institutions primarily located in New York, New York; and (c) causing U.S. financial institutions to process sanctioned transactions unknowingly.

4.    Additionally, as part of this criminal conduct, Credit Suisse: (a) deceived U.S. financial institutions into processing transactions they would not otherwise have processed; (b) prevented U.S. financial institutions from filing required Bank Secrecy Act

---

[1] References to "outgoing" messages indicate those payment messages that were transmitted by Credit Suisse to U.S. correspondent banks.  "Incoming" messages refer to: (a) payment messages sent by Sanctioned Entities to Credit Suisse for further transmission to U.S. correspondent banks; and (b) payment messages that were transmitted to Credit Suisse from U.S. financial institutions.

("BSA") and OFAC-related reports with the U.S. government; (c) caused false information to be recorded in the records of U.S. financial institutions; and (d) caused U.S. financial institutions not to make records that they otherwise would have been required by U.S. law to make.

5.      Credit Suisse altered USD payment messages by: (a) removing Iranian names and references from payment messages; (b) substituting abbreviations for Iranian customer names; and (c) inserting the phrase "one of our customers" instead of the actual names of its Iranian customers. In addition, Credit Suisse, through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), used code words for Sanctioned Entities when executing trades involving U.S. securities that were transmitted through the U.S. Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC. Credit Suisse manipulated payment messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks would not identify the transactions and so that, as a result, the transactions would be automatically processed.

6.      In addition to altering USD payment messages, Credit Suisse instructed its Iranian customers how to format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by U.S. financial institutions. In addition, Credit Suisse promised its Iranian customers that no messages would leave Credit Suisse without being hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters. When Credit Suisse employees

received payment messages that were not properly formatted by Iranian clients to avoid U.S. OFAC filters, Credit Suisse would alter or amend the messages to ensure that they would not be detected by U.S. financial institutions.

7.      In addition to training its Iranian bank customers how to format their payment messages to evade the OFAC filters, Credit Suisse also gave them materials to use in training other banks on how to prepare payment messages to evade the filters.

8.      By altering outgoing payment messages and by instructing its customers how to format messages to avoid U.S. OFAC filters, Credit Suisse caused U.S. financial institutions to process transactions that otherwise would likely have been held for investigation, rejected, or blocked, pursuant to OFAC regulations.  Credit Suisse thus prevented U.S. financial institutions from filing both required BSA and OFAC-related reports with the U.S. Government.  Credit Suisse continued to engage in these practices through 2006.

9.      In December 2005, Credit Suisse made the decision to wind-down its business with countries, entities, and persons sanctioned by the U.S. and thus to end both USD denominated and non-USD denominated business with the Sanctioned Entities.  In March 2006, Credit Suisse commenced an internal review of accounts at CSAM.  In March 2007, Credit Suisse commenced an extensive and thorough internal investigation of its historic USD clearing business involving U.S. sanctioned countries and persons.  Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.  As described herein, Credit Suisse has provided prompt and substantial assistance by sharing with DOJ and DANY, as well as the relevant regulators, the results of that internal investigation.

## II.    Credit Suisse's Business Organization and Assets

10.    Credit Suisse is a financial services company headquartered in Zurich, Switzerland. All of Credit Suisse's payment processing was handled in Switzerland and its CSAM transactions were handled in London. Credit Suisse is active in over 50 countries and has approximately 47,000 employees. The U.S. headquarters for Credit Suisse is located at 11 Madison Avenue, New York, New York. Credit Suisse serves clients worldwide through its Private Banking unit, which includes a Wealth Management and Corporate & Institutional Clients unit, an Investment Banking unit, and an Asset Management unit. Credit Suisse's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. The Swiss Financial Market Supervisory Authority (FINMA) is Credit Suisse's primary home-country regulator.

11.    As of September 30, 2009, Credit Suisse Group AG's year-to-date unaudited consolidated net income attributable to shareholders was approximately $5.72 billion. Total unaudited consolidated assets and liabilities as of the same date equalled $1 trillion and cash on hand was $47.18 billion.

## III.    Applicable Law

### Libyan Sanctions

12.    On January 7, 1986, President Reagan issued Executive Order 12543 imposing broad economic sanctions against Libya. One day later, the President issued Executive Order 12544 of January 8, 1986, also ordering the blocking of all property and interests in property of the Government of Libya. President George H. W. Bush strengthened those sanctions in 1992 pursuant to Executive Order 12801. On September 22, 2004, President George W. Bush issued Executive Order 13357, terminating the national

emergency with regard to Libya and revoking the sanction measures imposed by the prior Executive Orders.

### *Iranian Sanctions*

13.     In 1987, President Ronald Reagan issued Executive Order 12613, which imposed a broad embargo on imports of Iranian-origin goods and services.  In 1995 and 1997, President William Clinton issued Executive Order Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran.   The Executive Orders prohibit virtually all trade and investment activities between the U.S. and Iran, including but not limited to broad prohibitions on: (a) the importation into the U.S. of goods or services from Iran; (b) the exportation, sale, or supply of goods, technology or services from the U.S. or by a U.S. person to Iran; (c) trade-related transactions with Iran by U.S. persons, including financing, facilitating or guaranteeing such transactions; and (d) investment by U.S. persons in Iran or in property owned or controlled by Iran (collectively, the "Iranian Sanctions").[2]  With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Iranian Sanctions generally prohibit the export of services to Iran from the U.S.

### *Department of Justice Charge*

14.     DOJ has alleged, and Credit Suisse admits, that Credit Suisse's conduct, as described herein, violated Title 50, United States Code, Section 1705, part of the International Emergency Economic Powers Act ("IEEPA"), which makes it a crime to wilfully violate or attempt to violate any regulation issued under IEEPA, to wit, Title 31, Code of Federal Regulations, Sections 560.203 and 560.204, that prohibit: (a) the

---

[2] The Iranian Transactions Regulations ("ITR") are found at 31 CFR part 560 and can be reviewed at the OFAC website, located at www.ustreas.gov/ofac.

exportation from the United States of a service to Iran without authorization; and (b) any transaction within the United States that evaded and avoided, or had the purpose of evading and avoiding such regulations.

### New York State Penal Law Charge

15.     DANY has alleged, and Credit Suisse admits, that Credit Suisse's conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud... (i) make or cause a false entry in the business records of an enterprise...or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise." Falsifying Business Records in the First Degree as defined by Section 175.10 of the New York Penal Law is a felony when a person or entity commits Falsifying Business Records in the Second Degree and the person's or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission of a crime."

### IV.     Conduct of Credit Suisse: Historical Background

16.     As early as 1986, when Libyan sanctions were first implemented by the U.S., Credit Suisse began to assist its customers in evading such sanctions. Soon after the Libyan sanctions were issued, Credit Suisse instituted an internal policy that stated, "Payment orders of Libyan banks or government organizations to third party accounts in the United States or with U.S. banks abroad are to be executed without stating the name of the ordering party." By excluding such information, Credit Suisse knew that the payment messages would evade detection and automatically be processed by U.S. financial institutions.

17.     Over the years, Credit Suisse -- sometimes in consultation with its sanctioned country clients -- refined its methods to ensure that payments continued to be processed in the U.S. despite applicable sanctions.   In 1994, Credit Suisse issued an internal instruction advising that the phrase "By order of a client" could be used in payment messages if the ordering customer did not wish to be identified.   Several Credit Suisse employees interviewed in 2009 by U.S. and New York law enforcement officials stated that Credit Suisse purposely used the "By order of a client" phrase to conceal the identity of the Sanctioned Entities.

18.     As noted above, in 1995, President Clinton issued Executive Orders 12957 and 12959 strengthening U.S. sanctions against Iran.   In response, Credit Suisse acted promptly to find solutions to bypass the sanctions.   For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum which stated:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, [an Iranian bank] approached Credit Suisse to open [a type of correspondent banking account for U.S. dollar transactions]. Crucial to them was that the name of the bank would not be mentioned on the transfer orders…Subsequently, [the Iranian bank] was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems.   Meanwhile,   operations   through   this   account   have started…Some transfers have been rejected by the American banks as the name of [the Iranian bank] appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

19.     To overcome the enhanced U.S. sanctions, Iranian banks began requesting that Credit Suisse omit their names and Bank Identification Codes ("BICs") from payment messages sent by Credit Suisse to its U.S. correspondent banks. Credit Suisse complied

with the Iranian banks' requests and omitted the banks' names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

20.     Despite these efforts, Credit Suisse continued to experience problems processing USD payments for its sanctioned customers.  Several Iranian customer payments were rejected by U.S. financial institutions in the mid-1990s.  To address this problem, Credit Suisse and its Iranian customers discussed additional ways to avoid future rejection or delay for Iranian customer payments.  In 1995, an Iranian bank requested that Credit Suisse process all payments in favor of that Iranian bank with a cover payment method that would shield the Iranian bank's identity.[3]   Instead of using serial MT 103 payment messages, Credit Suisse began to use MT202 cover payment messages whenever possible to avoid revealing the identity of the ordering customer and beneficiary party for USD payments sent through U.S. financial institutions.  Credit Suisse used cover payment messages about 95% of the time for outgoing customer payments that involved Iran.  For non-sanctioned countries and entities, it used cover payments approximately 60% of the time.

21.     In addition to using cover payments, Credit Suisse agreed to remove names, BICs, and any other identifying information from Iranian payment messages sent to U.S. correspondent banks.  Credit Suisse employees knew that any references to Iran put the payments at risk of detection, rejection, delay, or possible blocking.  For any rejected or

---

[3] An MT 103 message is the de facto standard used in cross-border customer credit transfers and the MT 202 is the de facto standard used when making bank to bank credit transfers.  A cover payment is typically a SWIFT payment where a MT 103 payment message is sent between the originator and the beneficiary, but the actual funds are transferred through the U.S. by using a MT 202 bank payment that lacks the payment details of the MT 103.  As such, the U.S. institution will often not know who the funds are being transferred for or even that it involves a sanctioned country or entity.

blocked payments, the U.S. financial institutions would have been required under U.S. law to file reports with OFAC regarding such transactions.

***Credit Suisse 1998 Reorganization***

22.     In 1998, Credit Suisse First Boston AG ("CSFB"), a Credit Suisse subsidiary domiciled in Switzerland with operations in London and New York, New York, decided to transfer "[a]ll activities with Iran...into [Credit Suisse], including the representative office in Tehran." A July 29, 1999, internal Credit Suisse email states:

> As we all know, the purpose of the 'sanctioned countries' project is to minimize (or avoid all together) contact of CSFB with the four identified countries.[4] Within the BU transfer of the clients (primarily banks) from sanctioned countries to [Credit Suisse] we will however, in future, have a situation where [Credit Suisse] can process trade finance businesses with such countries by order of CSFB clients.

In communications with Iranian banks, Credit Suisse's Iran Desk stated that the decision to move the Iranian clients from CSFB to Credit Suisse was driven by U.S. sanctions concerns.

23.     In addition, Credit Suisse outsourced its USD clearing activities to the Bank of New York ("BoNY")[5] and other U.S. correspondent banks, primarily located in New York, New York. A CSFB senior manager stated in an internal memorandum that "the decision to outsource USD payment processing is primarily driven by the fact that...we still remain a small player in the USD payments. To build the volume needed...[is] an unrealistic option."

24.     To further their ongoing efforts to evade U.S. sanctions and to ensure that other U.S. financial institutions would automatically process this new stream of payments,

---

[4] Iran, Iraq, Libya, and North Korea, each of which was subject to U.S. sanctions pursuant to various Executive Orders.
[5] In July 1, 2007, Bank of New York became Bank of New York Mellon.

Credit Suisse notified its Iranian clients about the change in USD clearing from CSFB to U.S. correspondents and provided them with a pamphlet entitled "How to transfer USD payments." The pamphlet provided detailed payment instructions on how to avoid triggering U.S. OFAC filters.

***2003 Increase in Iranian business***

25.     In 2003, Lloyds TSB plc ("Lloyds") decided to terminate its USD clearing activity for all of its Iranian bank clients. In August 2003, Lloyds' Iranian customers agreed to move their USD clearing services to Credit Suisse. Despite reports that Lloyds' clients were satisfied with Lloyds and did not want to diversify their correspondent accounts, Credit Suisse did no due diligence to determine why nearly every Iranian bank customer of Lloyds left it for Credit Suisse. As a result of this sudden shift in business, Credit Suisse became one of the main USD clearing banks for the Iranian banking system, increasing the number of Iranian USD payments from approximately 49,000 in 2002 to nearly 200,000 in 2005.

## V.     Special Services for Iranian Clients

26.     With the knowledge that Iranian references in SWIFT messages sent to U.S. financial institutions would lead to the rejection or blocking of payments, Credit Suisse employed a payment system wherein all payments involving Iran were manually reviewed before they were sent to U.S. financial institutions. If the payment contained any Iranian reference, Credit Suisse altered the payment before sending it to the U.S. Employees of Credit Suisse used this process as a marketing tool, noting to their sanctioned clients, "*[I]t is absolutely impossible that one of your payment instructions will be effected without having it checked in advance by our specially designated*

*payment team at Credit Suisse in Zurich* and all team members are most professional and aware of the special attention such payments of yours do require" (italics in original). Credit Suisse assisted its Iranian customers and assured the processing of Iranian USD transactions by providing guidelines on how to format payment messages to ensure they would not be rejected or blocked by OFAC filters at U.S. financial institutions.

27.     Credit Suisse employees believed that BoNY would not process any Iran-related transactions, legal or illegal, from Credit Suisse.   Credit Suisse employees further believed that the only way for Credit Suisse to get Iranian transactions through BoNY was to ensure that BoNY's filters could not identify the Iranian origin of the transactions. BoNY would then process the Iranian transactions without knowing where the money was destined.   As stated in one internal Credit Suisse communication, "since only the [Iranian] account number was mentioned, [BoNY] probably were not aware of where they paid the money to."

28.     Beginning as early as 1995 and continuing until 2005, Credit Suisse, both internally and with its Iranian clients, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its USD correspondents.   Credit Suisse's internal communications showed a continuous dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions to promote increased business from existing and future Iranian clients.   An internal Credit Suisse memorandum dated March 12, 1999 stated:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there [sic] almost every week cases that are processed incorrectly by us.

In May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

### Alteration of Field Data

29.      From as early as 2002, Credit Suisse employees altered the field data of Iranian messages being sent to U.S. financial institutions.  The alteration of data included the removal of Iranian names, addresses or telephone numbers and the replacement of Iranian remitter names with terms such as "Order of a Customer" or "Credit Suisse."  In some instances, changes were made to SWIFT messages by request of the originating Iranian banks.  If further clarification was needed on a payment order, it was forwarded to Credit Suisse's "Investigations" unit within payment processing, which would then contact the originating Iranian bank and inquire how to amend the payment so that it could be processed.  Credit Suisse employees also made material changes or removed Iranian information from payment messages on their own initiative.

### "Order of a Customer" Practice

30.      As early as 1997, Iranian banks requested that Credit Suisse not forward the identity of the Iranian banks to the U.S. when engaging in USD transactions.  Credit Suisse responded by assuring its Iranian clients: "Kindly note that we take care of your request with the highest cautiousness."  By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.  This procedure was promoted at Credit Suisse, as demonstrated by an email from a Team Leader in the Bank Payments

unit. The email stated, "In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone." Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment messages to ensure they would pass through the U.S. financial institutions undetected by U.S. OFAC filters. For example, one such screenshot showed an incoming payment message listing an Iranian bank as the ordering institution in SWIFT field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US." A second screenshot showed an incoming payment with the reference "without mentioning our banks [sic] name" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments." Until 2004, Credit Suisse's use of "Order of a Customer" was a standard procedure for processing bank payment messages involving its Iranian customers.

### *Population of Field 52*

31.     In addition to populating SWIFT field 52 with the words "Order of a Customer," Credit Suisse forwarded some Iranian USD payment messages to U.S. financial institutions with misleading information in the same field.

32.     In this regard, Credit Suisse received certain payment messages from an Iranian bank wherein field 52 was falsely populated with "Credit Suisse" or the Credit Suisse BIC code. Credit Suisse employees were aware of the Iranian bank's method of populating field 52 with "Credit Suisse" in its bank payment messages, yet they forwarded those messages to U.S. financial institutions as received. A November 2000

email circulated by a team leader in Credit Suisse's Bank Payments unit contained screenshots of an incoming payment order from an Iranian bank in which Credit Suisse was listed as the ordering institution in field 52. The instructions were to make no changes to the misleading information in field 52 for serial payment messages made to U.S. financial institutions.

33.     A different Iranian bank sent payments to Credit Suisse with the beneficiary bank falsely listed as the ordering institution. Credit Suisse employees forwarded this incorrect information to U.S. financial institutions.

*Use of Abbreviations*

34.     In addition to deleting references and providing false information, Credit Suisse developed another practice whereby the Iranian beneficiary bank was identified by an abbreviation for USD payments. Credit Suisse's Iran Desk was involved in promoting the use of abbreviations. In an April 16, 2003 email, the head of the Iran Desk wrote to the Credit Suisse representative office in Tehran, "[E]ntry to their account works when account number plus [XXX] is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work." Despite the use of abbreviations, U.S. financial institutions were able to reject or block payments to Iranian beneficiaries when the U.S. financial institutions began to identify and understand the meaning of the abbreviations. Most payment messages were automatically processed by U.S. financial institutions and unless the institutions had some other reason to stop the payment, the payments would not be reviewed or halted.

35.     Credit Suisse also employed "insider knowledge" to evade U.S. correspondents' enforcement of governmental and internal regulations; as one Credit Suisse employee stated, "From my own experience as a trainee at [BoNY], I got to know the OFAC filter. Once BoNY will have discovered the connection between the account no. [CS a/c no.] and [Iran bank], the OFAC filter of BoNY will filter out all future payments with these data."

36.     In December 2003, an Iranian beneficiary bank asked Credit Suisse for an additional USD account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, i.e., PLC).  On January 28, 2004, Credit Suisse confirmed that it had opened the requested account, writing to the Iranian bank, "Reference is made to the various conversations and your email, dated December 18, 2003 wherein you asked us to open a new USD account…Now, we would like to confirm the account number as follows: [acct # redacted]."

*Increase in Cover Payments*

37.     In October 2001, Special Recommendation VII ("SR VII") of the Financial Action Task Force ("FATF") stated that countries should take measures to require financial institutions to include accurate and meaningful originator information on funds transfers and related payment messages.  It further stated that member countries should closely monitor any funds transfers that did not contain complete originator information. To implement SR VII, the Swiss Federal Banking Commission ("SFBC") issued a new Ordinance on Money Laundering that came into effect on July 1, 2004, that required the disclosure of the identity of the remitter in payment orders.  Faced with these new

regulations, Credit Suisse's Iran Desk discussed whether it would be possible to identify an Iranian beneficiary's bank with the account number alone. In June 2004, Credit Suisse amended its prior internal directive and henceforth, prohibited the use of "Order of a Customer" and similar expressions for all international wire transfers, including customer and bank payment messages. Because Credit Suisse was no longer legally permitted by Swiss banking law to use the wording "Order of a Customer" in field 52 when forwarding an Iranian bank payment order, nearly all payment messages were thereafter processed with the cover payment method. Thus, Credit Suisse began using cover payments where it previously would have used serial payments.[6]

38.    In order to maintain its USD clearing for its Iranian customers after the implementation of SR VII and the accompanying changes in Swiss banking law, Credit Suisse sent guidelines containing cover payment method instructions to its Iranian customers. These instructions stated, "For the cover payment the instructing bank will issue a second MT 202 directly to their US bank correspondent, only mentioning Credit Suisse as beneficiary...If an account number is requested, then the account number...of Credit Suisse, Zurich with [BoNY] may be indicated."

*Credit Suisse employee's summary of procedures*

39.    Credit Suisse created the above procedures specifically to provide prohibited USD clearing services to Iranian and other Sanctioned Entities. A Credit Suisse internal email dated September 24, 2003, sent from a team leader in Customer Payments to a sector

---

[6] For example, on September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian bank. Using the cover payment method, during the six weeks from September 11, 2006, to October 27, 2006, Credit Suisse, nevertheless, processed fifty-four outbound payments involving that Iranian bank, the total value of which was in excess of $8 million.

head within Customer Payments, described the process for Credit Suisse's Iranian USD

processing as follows:

> The procedure is identical for all Iranian banks: 1) We attempt to send all
> USD payments directly to the bank of the beneficiary. Only cover
> payments are made through the US. In such cases, the ordering institution
> is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an
> American bank or if no Swift connection or no correspondent was named),
> then the payment will be made through America. We make sure that the
> ordering institution is not mentioned (this has been programmed into the
> system as a default) and that the ordering customer has no connection to
> 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be
> forwarded to Investigations for further clarifications with the ordering
> institution.

### Credit Suisse internal discussions regarding USD clearing/CIF warnings

40.     Credit Suisse's payment system included specific intra-company warnings

designed to ensure payment messages were reviewed and properly processed according

to internal procedures.   Initially, warnings were loaded into the Credit Suisse Customer

Information Files ("CIF").   In February 1999, the Credit Suisse Iran Desk added internal

warnings to the accounts of its Iranian bank customers, expressly directing Credit Suisse

employees: "Do not mention the name of the Iranian bank in payment orders."   In 2002,

another warning was loaded in the CIF which likewise stated: "FOR USD-PAYMENTS

OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME

OF THE IRANIAN BANK."   Credit Suisse decided to remove warnings from the CIFs

and to replace them with long-term instructions concerning Iranian entities that stated,

"Execute USD payment orders always with direct order and cover payment."   These

instructions intended that "an Iranian origin will never be named in USD payments

carried out for Iranian banks (because of the US sanctions)!"

### Credit Suisse sent guidelines to Iranian customers

41.     In addition, Credit Suisse provided its Iranian customers with guidelines detailing how payment messages should be formatted and processed to evade U.S. OFAC filters. In a 1998 letter to an Iranian customer, explaining the transfer of its USD clearing services to BoNY, Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD-payments through our clearing system.  The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

According to those instructions, the MT202 sent to the USD-clearing bank was completed "without mentioning [the Iranian bank's] name."   Payment instructions included a letter from Credit Suisse's Iran Desk to an Iranian customer dated October 16, 2003, that stated, "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."   Credit Suisse consistently advised its Iranian customers: "Under no circumstances any link to your good bank or Iran should be mentioned."

42.     Between March 2004 and November 2005, Credit Suisse repeatedly sent similar letters to its Iranian customers describing its internal procedures for forwarding Iranian payment orders as: "Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing 'Direct payment order and cover payment order.'"   The effect of this training and assistance from Credit Suisse to its Iranian customers was dramatic.   For example, nearly 96% of customer payment messages relating to Iranian customers were made using cover

payments. However, for non-sanctioned payment messages, a mere 60% were made using cover payments.

## VI. SDN Transactions

43.    In addition to the prohibited Iranian transactions, Credit Suisse processed transactions for Specially Designated Nationals ("SDNs"). SDN's are individuals and companies owned or controlled by, or acting for or on behalf of, certain targeted countries sanctioned by the U.S. They are generally prohibited from conducting business in the U.S. or with U.S. financial institutions.

44.    Credit Suisse processed hundreds of Libyan SDN payments through U.S. financial institutions. Additionally, Credit Suisse processed eighty-eight SDN payments for individuals and companies from other countries, primarily Burma,[7] Sudan,[8] and Iran, through U.S. financial institutions. Of these eighty-eight payments, twenty were serial payments that were blocked by U.S. banks and sixty-eight were cover payments that were not blocked by U.S. banks.

## VII. Sudanese and Other Sanctioned Entities Payments

45.    Credit Suisse sent at least forty outbound payment messages involving Sudan without a discernible OFAC exemption.

46.    Credit Suisse sent at least thirty outbound payments involving Burma without a discernible OFAC exemption.

---

[7] In July 2003, President Bush issued Executive Order 13310 which prohibited (i) the exportation or re-exportation of financial services to Burma, directly or indirectly, from the United States and/or (ii) dealing in property and interests in property that come within the United States of persons listed in the Annex to Executive Order 13310.

[8] In 1997 and 2006, Presidents Clinton and George W. Bush issued Executive Orders Nos. 13067 and 13412, respectively, which imposed a trade embargo against Sudan and prohibited the dealing in property and interests in property of the Government of Sudan (collectively, the "Sudanese Sanctions").

47.     Credit Suisse sent at least thirty-two outbound payment messages in which the Government of Cuba or a Cuban national had an interest through financial institutions located in the U.S. in violation of the Cuban sanctions.[9]

48.     These outbound payments messages were sent knowingly by Credit Suisse and in violation of U.S. and New York State law.

## VIII. Securities

### Credit Suisse Asset Management's Relationship with BADEA and LAFICO

49.     CSAM maintained asset management relationships with the Arab Bank for Economic Development in Africa ("BADEA") and the Libyan Arab Foreign Investment Company ("LAFICO") to manage their fixed income portfolios and an equity portfolio for BADEA.  BADEA is a development bank established in 1974 by the governments of the member states of the League of Arab States and is headquartered in Khartoum, Sudan.  LAFICO is a Libyan state-owned investment company.  U.S., U.N., and U.K.[10] sanctions against Libya were in effect when CSAM began managing LAFICO's funds and transactions for both BADEA and LAFICO were prohibited.  OFAC sanctions against Libya were not lifted until September of 2004.

### Special Procedures for LAFICO and BADEA

50.     In August 2000, a senior CSAM officer issued a memorandum to those responsible for the BADEA and LAFICO accounts, setting out procedures that varied from the standard operating procedures.  The procedures were designed to use code

---

[9] Regulations implementing sanctions under the Trading With the Enemy Act, 50 U.S.C. App. §§ 1-44 were issued on July 8, 1963, and prohibit, among other things, transactions involving Cuba or nationals of Cuba between, by, through, or to any banking institution wherever located with respect to any property subject to U.S. jurisdiction in which Cuba or a Cuban national has or has had any interest.

[10] CSAM had received permission from the Bank of England to manage LAFICO's "blocked" funds pursuant to an agreement with the Bank of England in 1996.

names at all times, restrict knowledge of the clients' identities internally and externally, restrict communications from the client to the client teams and the legal and compliance departments, prohibit U.S. citizens from working on the accounts and prevent trades involving these accounts and U.S. counterparties.  CSAM used the code names "CB," "Confidential Client CB," and "Wood" for BADEA to evade OFAC sanctions.  Similar to BADEA's code name of "Wood," CSAM gave the LAFICO account the code name "Iron," again with the purpose of evading OFAC sanctions.

51.     Between 2000 and 2006, CSAM executed trades involving U.S. securities on behalf of BADEA and LAFICO through its omnibus account at Credit Suisse USA in New York and at other brokerages in the United States.   While the majority of the transactions were processed through Credit Suisse's U.S. office, some were routed through other U.S. brokerages.  CSAM also utilized code names to disguise the names of the sanctioned parties and maintained sub-accounts in these names in its omnibus account maintained at Credit Suisse USA.

## IX. Scope of Conduct

52.     As set forth herein, for more than a decade, Credit Suisse executed money transfers designed to evade detection by OFAC filters at U.S. financial institutions.  In doing so, Credit Suisse altered SWIFT payment messages for Iranian banks and other Iranian entities.  Further, Credit Suisse provided special services to ensure that payments in violation of IEEPA and OFAC regulations for Iran, Sudan, Burma, Cuba and Libya cleared through U.S. financial institutions.  The total value of these transactions exceeded $1.6 billion.

## X. Credit Suisse's Decision to Terminate Business with Sanctioned Countries

*Merger of CSFB and Credit Suisse*

53.     In August 2004, Credit Suisse's Group Executive Board and the Board of Directors of Credit Suisse Group approved further exploration of a merger between Credit Suisse and CSFB.  As a result, Credit Suisse realized it could no longer ensure that its U.S. employees would be segregated from business relationships involving U.S. sanctioned countries and entities, therefore leaving them at risk of violating U.S. law.

*Project Uno looks into business with U.S. sanctioned countries*

54.     In December 2004, Credit Suisse initiated an internal project called "Project Uno" in an effort to fully integrate the bank's business lines within its organizational structure. Within the context of "Project Uno," Credit Suisse established a special task force to review the status of its business relationships with U.S. sanctioned countries and to propose options for the future.  On May 13, 2005, the merger of Credit Suisse and CSFB was formally executed, thus reinforcing Credit Suisse's need to address the issues surrounding its business with U.S. sanctioned countries and entities.

*Decision to end relationship with sanctioned countries*

55.     On December 20, 2005, Credit Suisse's Group Executive Board decided to discontinue all business with U.S.-sanctioned countries, with the exception of existing relations with private banking customers from Iran and Syria, subject to strict restrictions. To avoid suffering any losses or risk contractual breaches, Credit Suisse decided to wind down the business over the course of a year.

*2007 - Credit Suisse ends relationship with remaining private banking customers from Iran*

56.    In October 2007, Credit Suisse decided to terminate its relationships with its remaining private banking customers from Iran.  All relationships with private banking customers domiciled in Iran were to be terminated by the end of June 2008.

### XI. Actions Taken by Credit Suisse Prior to Investigation

57.    In 2006, Credit Suisse commenced taking significant steps to rectify the deficiencies described herein.   Credit Suisse's extensive remediation efforts have included the following:

a.  Amending existing policies and issuing new policies providing for enhanced standards in relation to U.S. sanctions programs and the procedures for ensuring compliance with these enhanced standards;

b.  Designating compliance with U.S. sanctions programs as a standard item of internal audits;

c.  Establishing competence centers and designating individuals responsible for coordinating and monitoring compliance with U.S. sanctions programs;

d.  Introducing U.S. sanctions training programs, which are mandatory for all payment processing employees;

e.  Enactment of a confidential communications channel for employees to report potential misconduct; and

f.  Implementing sanctions filters screening all incoming and outgoing transactions for references to countries and persons sanctioned under United States laws.

### XII. Credit Suisse Cooperation

58.    Throughout the course of this investigation, Credit Suisse has provided prompt and substantial cooperation to DOJ and DANY including the following:

a.  Working with DOJ, DANY, the Federal Reserve Bank of New York and relevant Swiss authorities to develop an effective approach to disclose, in compliance with Swiss law, data, communications, and documents underlying the misconduct;

b.  Committing significant resources to conduct an internal investigation into the provision of USD clearing services to the Sanctioned Entities;

c.  Conducting an exceptionally detailed review of all incoming and outgoing USD payments processed by Credit Suisse, via SWIFT, in the period from January 1, 2002, to April 30, 2007, against OFAC watch lists of all categories of Specially Designated Nationals ("SDNs") and to identify payments which were cleared through U.S. banks and which possibly were not covered by an exemption under the OFAC sanctions programs against Burma, Cuba, Iran, Sudan, and North Korea as in force at the time of the payment;

d.  Conducting an extensive SWIFT data analysis, document review, and interviews to identify "special methods" that were used in the period beginning in 1995 and ending on April 30, 2007 for the purpose of preventing U.S. banks from noticing the involvement of Iranian banks or persons in USD payments;

e.  Providing regular and detailed updates to DOJ, DANY, OFAC, and the Federal Reserve Bank of New York on the results of its investigation and forensic SWIFT data analyses and responding to additional specific requests of DOJ and DANY;

f.  Making available employees of Credit Suisse for interview by U.S. and New York law enforcement officials; and

g.  Agreeing, as part of its cooperation with DOJ and DANY to certify that it has successfully enhanced and optimized its sanctions compliance programs and is

adhering to best practices in its international payment operations. Credit Suisse has also agreed to cooperate in DOJ and DANY's ongoing investigations into these banking practices and pledged to work with OFAC and its regulators to ensure ongoing sanctions compliance. Furthermore, Credit Suisse is a founding member of the Wolfsberg Anti-Money Laundering Principles of Correspondent Banking and will adhere to best practices in the industry.